**R. GRIGGS GROUP LIMITED,**
a company of the United
Kingdom, Plaintiff,

v.

**FILANTO SPA, an Italian
company, Defendant.**

No. CV–N–95–00379–DWH.

United States District Court,
D. Nevada.

Feb. 5, 1996.

John Frankovich, Marcy J. Bergman, Steven M. Selna, J. Suzanne Siebert, Reno, NV, for plaintiff.

Richard Glasson, Chris D. Nichols, Reno, NV, for defendant.

### MEMORANDUM DECISION AND ORDER

HAGEN, District Judge.

Before the court is defendants' motion to quash service of process (# 16). For the reasons stated below, defendants' motion to is denied.

## Background

Plaintiff R. Griggs Group, Ltd. (hereinafter Griggs), a company of the United Kingdom, filed this action against Filanto Spa (hereinafter Filanto), an Italian company, for trademark infringement, seeking damages and declaratory and injunctive relief. From February 21 to 24, 1995, Griggs participated in a footwear trade show in Las Vegas, Nevada. During the trade show, Griggs identified Filanto as marketing footwear which allegedly bore a trade dress substantially identical to those manufactured and trademarked by Griggs. In March, Griggs participated in another footwear trade show in Bologna, Italy, at which Griggs again identified Filanto as marketing allegedly infringing footwear.

Griggs attempted to serve process on Filanto in two ways. First, it served a Giorgio Lumo[1] at the Las Vegas trade show. Griggs also attempted to serve Filanto by mailing a summons and complaint to Antonio Filograna, Commercial President Commander, at Filanto's offices in Italy via Federal Express. The package was delivered on August 28, 1995, and signed for by Luigi Serrano. Filanto moved to quash service on Mr. Lumo.

## Service on Mr. Lumo

█ Filanto's motion (# 16) purports to move to quash service on Giorgio Lumo pursuant to F.R.C.P. 12(b)(4). Although federal courts have the authority to quash defective service of process as an alternative to dismissing a complaint, the Federal Rules of Civil Procedure technically do not provide for Motions to Quash. *Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737, 740 (2d Cir.1985). F.R.C.P. 12(b)(5) is the correct provision for challenging defective service. Therefore, the court deems Filanto's motion to be a Motion to Dismiss for insufficiency of service of process pursuant to F.R.C.P. 12(b)(5).

█ The Hague Convention On The Service Abroad Of Judicial And Extrajudicial Documents In Civil Or Commercial Matters (hereinafter the Hague Convention) applies when the internal law of the forum country requires the transmittal of documents abroad as a necessary part of the service. *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). The Hague Convention provisions are mandatory; failure to comply voids the attempted service. *Id.* However, where service on a domestic agent of a foreign defendant is valid and complete, the Hague Convention has no further implications. *Id.*

█ Giorgio Lumo's relationship to Filanto is unclear. However, an unrefuted affidavit from Antonio Filograna establishes that he is not an officer, director, employee, managing agent, or general agent of Filanto nor is he an agent authorized by appointment or by law to receive service of process on behalf of Filanto. (Defendant's Motion to Quash, Filograna Affidavit, ¶¶ 3, 4). Plaintiff has made no showing that Mr. Lumo was sufficiently integrated with the organization to render service upon him fair, reasonable and just. *Cf. Direct Mail Specialists, Inc. v. Eclat Computerized Technologies, Inc.,* 840 F.2d 685 (9th Cir.1988). While the process server may have thought he was serving a legal representative of Filanto (*see* Return of Service (# 17); "served Georgio Dumi (legal representative—employee)"), no facts have been presented to the court to support this assumption and that assessment has no bearing on the court's determination. Plaintiff freely admits that it has yet to conduct discovery and does not know the extent or nature of Mr. Lumo's involvement with Filanto, yet asks the court to share its view that "considering the circumstances surrounding the service, it is apparent that Mr. Lumo represented Filanto during the WSA show" and that "clearly some formal relationship existed" between them. This the court declines to do. The burden is on the plaintiff to establish the propriety of the service. *Aetna Business Credit, Inc. v. Universal Decor & Interior Design, Inc.* 635 F.2d 434, 435 (5th Cir.1981). Because Mr. Lumo is not an

---

1. The proof of service of the summons and complaint describes personal service on a Giorgio Dumi; Antonio Filograna's affidavit refers to a Giorgio Lumi. Per Elizabeth Deen's declaration, the correct spelling of the individual's name is Giorgio Lumo. (Plaintiff's Opposition, Deen Declaration). There is every indication that all references describe the same person. In the interest of clarity, the court will use the spelling endorsed by Ms. Deen.

officer, director, employee, managing agent, or general agent of Filanto nor is he an agent authorized by appointment or by law to receive service of process on behalf of Filanto, the court finds that the attempted domestic service upon him was ineffective under Rule 4.

■ Although defendant's original motion referred only to the attempted service upon Mr. Lumo, the record reflects that Griggs also attempted to serve Filanto by mailing a summons and complaint to Antonio Filograna, Commercial President Commander, at Filanto's offices in Italy via Federal Express.[2] Because substantive legal arguments in both plaintiff's opposition and the subsequent memoranda filed with the court by both parties specifically address this attempt at service, the court now considers the matter of Federal Express service on Mr. Filograna.

*Service of Process by Mail Under the Hague Convention*

■ "Service of process" is a formal delivery of documents that is legally sufficient to charge the defendant with notice of a pending action. *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). Service of process must comply with both constitutional and statutory requirements. Constitutional due process requires that service of process be reasonably calculated to provide actual notice. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). In this case, defendant does not contest the fact that it received actual notice, nor does it contend that the notice was constitutionally defective. Thus, the question before the court is purely statutory.

Federal Rule of Civil Procedure 4 governs service of process. Strict compliance with the rules governing manner of service is required. Under Rule 4(f), service of process upon individuals in foreign countries is governed by the methods set forth by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention On The Service Abroad Of Judicial And Extrajudicial Documents (hereinafter the Hague Convention). F.R.C.P. 4(f)(1). Because both Italy and Great Britain are signatories to the Hague Convention, service of process on an Italian defendant in Italy by a British plaintiff is governed by the Hague Convention. *Volkswagenwerk,* 486 U.S. at 705, 108 S.Ct. at 2111 (1988). If the applicable international agreement, in this case the Hague Convention, allows, service may be effected by a manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction. F.R.C.P. 4(f)(2)(A). Article 19 of the Convention provides that service of documents from abroad may be made by any method permitted by the internal law of the receiving state. Thus, service by mail is proper if allowed either by internal Italian law or by provisions of the Hague Convention itself. Neither party has placed before the court any evidence of Italian law regarding the propriety of service by mail; therefore, the court will consider only whether service was proper under the Hague Convention.

The Hague Conference on Private International Law is an international forum for discussing and proposing methods for unifying rules of private international law. B. Ristau, *International Judicial Assistance (Civil And Commercial),* 1990 Revision, Vol. 1, § 1–1–2. The tenth session of the Conference culminated in the Hague Convention On The Service Abroad Of Judicial And Extrajudicial Documents In Civil Or Commercial Matters,[3]

---

**2.** The record also contains an August 23, 1995, letter to Mr. Filograna from plaintiff's counsel, which apparently accompanied the Federal Express'ed summons and complaint, indicating that a copy of the summons and complaint had previously been delivered to Mr. Filograna by plaintiff's Italian counsel, Pier Luigi Roncaglia. Because the parties do not address this delivery as an attempt at service, the court expresses no opinion on the validity of that method of service.

**3.** Hague Convention On the Service Abroad of Judicial And Extrajudicial Documents In Civil Or Commercial Matters, *opened for signature* November 15, 1965; *entered into force for the United States* February 10, 1969; *for Italy* January 24, 1982; *for the United Kingdom* February 10, 1969; 20 U.S.T. 361; 658 U.N.T.S. 163.

which was opened for signature on November 15, 1965. *Id.* The purpose of the contracting states in adopting the Convention was to ensure timely notice to litigants and multilateral judicial efficiency. The heart of the Convention was a requirement that each signatory state both establish a Central Authority for receiving requests for service from litigants in signatory states and execute such foreign service requests. *Id.,* § 4-3-1. However, use of the Central Authority for service is not mandatory; Articles 8 through 11 provide for alternate methods of service. *Id.,* § 4-3-5. At issue in this case is whether section (a) of Article 10 provides one of those alternate methods of service.

■ Plaintiff argues that Article 10(a) of the convention provides for service by mail; defendant argues that it does not. Article 10(a) provides, in relevant part:

> Provided the State of destination does not object, the present Convention shall not interfere with—
>
> (a) the freedom to send judicial documents, by postal channels, directly to persons abroad.

The issue is whether the word "send" in this context refers to service of process.

Neither Supreme Court nor the Ninth Circuit have decided this issue. In the federal courts, two distinct lines of cases interpreting Article 10(a) have emerged. In *Ackermann v. Levine,* 788 F.2d 830 (2d Cir.1986),[4] the Second Circuit interpreted the word "send" in Article 10(a) to mean "service". The court looked to the overall purpose and structure of the treaty, and, citing to a California state court case with approval[5], reasoned that 10(a) would be superfluous unless it referred to sending documents for service. The court reconciled the variance in terminology between "send" in Article 10(a) and "effect

service" in Article 10(b) and (c) by attributing it to "careless drafting". *Id.* at 839.

In *Bankston v. Toyota Motor Corp.,* 889 F.2d 172, 173-74 (8th Cir.1989), the Eighth Circuit viewed Article 10(a) as providing a method for transmitting judicial documents abroad only after service of process has been accomplished. The court held that the word "send" is not the equivalent of "service of process", reasoning that the drafters, having used the word "service" in 10(b) and 10(c) and omitting it in 10(a), acted "intentionally and purposely in the disparate inclusion or exclusion." *Id.* at 174, citing *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983).

As between these two approaches, the court is of the view that the *Ackermann* approach has more to recommend it. While the court recognizes that Articles 2 through 7 of the Hague Convention effected a major innovation in international law by creating the Central Authority as the principal mechanism for service of process in signatory countries, *see Volkswagenwerk,* 486 U.S. at 699, 108 S.Ct. at 2107-08, it is uncontroversial that service through a Central Authority is not the exclusive method authorized by the Convention. The structure of the Convention and the placement of 10(a) within the Article 10 list of alternate methods of service to which the contracting states were specifically authorized to object[6] suggest that the word "send" was used as a synonym for "serve". If 10(a) were intended only to preserve the right to use postal channels for non-service correspondence, it would be out of place in Article 10, in Chapter 1, and indeed in the Convention itself.

Articles 8 through 11 within Chapter 1 of the Convention all discuss alternatives to the use of the Central Authority procedures detailed in Articles 2 through 7. For example,

---

4. *Ackermann* involved mail service on an American defendant in the United States with regard to a suit filed against it in Germany. The court held that because the United States had not objected to the use of "postal channels" as provided for in Article 10(a), service by mail was an appropriate method of service in that country under the Convention.

5. *Shoei Kako Co., Ltd. v. Superior Court,* 33 Cal. App.3d 808, 109 Cal.Rptr. 402 (1973).

6. In addition to Article 10, which uses the qualifying phrase "[p]rovided the State of destination does not object", Article 21 provides that "[e]ach contracting State shall ... inform the Ministry, where appropriate, of—(a) opposition to the use of methods of transmission pursuant to articles 8 and 10."

Article 8 provides that a state may use its own diplomatic or consular agents to "effect service directly" upon persons abroad. Article 9 provides for the use of consular or diplomatic channels to forward documents to the appropriate authorities of another contracting state for service. Article 10(b) and 10(c) provide for the use of judicial officers, officials or other competent persons of a contracting state to effect service, whether at the behest of a litigant or other judicial officers etc., subject to a contracting state's right to object. Article 11 provides that two or more contracting states may agree among themselves to use alternate channels of service. In Chapter 3, entitled General Clauses, Article 19 provides that service of documents from abroad may be made by any method permitted by the internal law of the receiving state. In this context, it is not surprising or incongruous that mail service would be another option available to the transnational litigant.

Because the Convention as a whole does not purport to address aspects of litigation other than service of process, Article 10(a) would be anomalous if it related to a subject other than service. The preamble to the Convention describes the purpose of the contracting states in adopting the Convention as, in substance, ensuring timely notice to litigants and ensuring multilateral judicial efficiency. Article 1 of the Convention provides that it is applicable to every civil or commercial case where there is occasion to transmit a judicial or extrajudicial document abroad, and the whole of Chapters I and II of the Convention, Articles 2 through 17, involves service of such documents. The placement of one lone subprovision dealing with the mailing of nonservice documents in the midst of fifteen articles addressing service of process, would be inconsistent with the structure of the entire Convention.

While not untroubled by the textual distinction between "send" and "serve", on balance, the court cannot ascribe to it the signif-

icance found by the *Bankston* court. In the interpretation of treaties, courts are obliged to consider not only the text, but the "context in which the written words are used." *Volkswagenwerk,* 486 at 699, 108 S.Ct. at 2108. Moreover, "[t]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Id.* (internal citations omitted); *see also* Vienna Convention On The Law Of Treaties, May 23, 1969, *entered into force* January 27, 1980, 1155 U.N.T.S. 331, Articles 31 and 32 (providing general rules and supplementary means of interpretation)[7].

Although it is true that the word "serve" (or "service") is used fairly consistently throughout the Convention, it is inaccurate to suggest, as the *Bankston* court did, that 10(a) is unique in the Convention in not referring to service. *See Bankston,* 889 F.2d at 173. For example, Article 21 requires official notification by contracting states if they object to "methods of transmission" provided for in Articles 8 and 10. Clearly, "transmission" is used as a synonym for "service" in Article 21. *See Volkswagenwerk* 486 U.S. at 707, 108 S.Ct. at 2112 ("The only transmittal to which the Convention applies is a transmittal abroad that is required as a necessary part of service."). Therefore, it would be error to strictly apply the principle of "expression unius est exclusio alterius" to the word "send" in Article 10(a) Furthermore, an inspection of the accession declarations made by the signatory states reveals that at least some of them understood 10(a) to provide for a method of service. *See, e.g.,* declarations of Canada ("Canada does not object to service by postal channels.") and Czechoslovakia ("In accordance with Article 10 ... documents may not be served by another Contracting State through postal channels ...").

---

7. The United States is not a signatory to the Vienna Convention; however, it has been the policy of the United States that Articles 31 and 32 are declaratory of customary international law, and will be so applied by the United States. *See* 75 Am.J.Int'l L. 147 (1981), republishing a September 12, 1980 letter to Senator Adlai E. Stevenson from the Legal Advisor of the Department of State; *see also* Rest.3d Of The Foreign Relations Law Of The United States, Part III, introductory note (1986).

Both the *Ackermann* and *Bankston* decisions have been criticized on the grounds that they fail to consider appropriate supplementary sources of interpretation. *See, e.g.,* Patricia N. McCausland, Note and Comment, *How May I Serve You? Service Of Process By Mail Under The Hague Convention On The Service Abroad Of Judicial And Extrajudicial Documents In Civil Or Commercial Matters,* 12 Pace L.Rev. 177 (1992). According to several commentators, these supplementary sources suggest that Article 10(a) should be read as authorizing service by mail in those countries who have not objected to such service in a declaration pursuant to Article 21.[8] *Id.; see also* Franklin B. Mann, Jr., Comment, *Foreign Service of Process By Direct Mail Under the Hague Convention And The Article 10(a) Controversy: Send v. Service,* 21 Cumb.L.Rev. 647 (1991); B. Ristau[9] *International Judicial Assistance (Civil And Commercial),* 1990 Revision, Vol. 1, § 4–3–5.

For example, in 1989, a special commission of experts chosen by their respective signatory governments met to discuss the operation of the convention, resulting in the 1992 publication of a handbook as a guide to law practice under the Convention. *See Practical Handbook On The Operation Of The Hague Convention Of 15 November 1965 On The Service Abroad Of Judicial And Extrajudicial Documents In Civil Or Commercial Matters,* 2d Ed., v–vi, 1992 (hereinafter *Handbook*). The *Handbook,* described in the introductory "Notice to the Reader" as "the product of close cooperation between the Governments of these [member] States, through the intermediary of the Permanent Bureau", *id.* at vi, reflects a consensus among the member states that Article 10(a) provides a method of service. *Id.* at 42–45. The *Handbook* critiques the line of cases, including the Eighth Circuit *Bankston* decision, holding that 10(a) does not allow mail

service, as contradicting not only the implicit understanding of the delegates to the earlier (1977) Special Commission meeting but substantial legal literature on the Convention and its predecessor treaties. *Id.* at 44, 45.

The 1989 report of the Special Commission itself reflects the reasoning of the Commission that the contracting states would not have been offered the opportunity to object to the 10(a) provision on the basis that such use of the postal channels constituted an infringement of their sovereignty unless such use constituted service; "[t]hus, theoretical doubts about the legal nature of the procedure were unjustified." *Special Commission Report On The Operation Of The Hague Service Convention And The Hague Evidence Convention* (hereinafter *Special Commission Report*), reproduced at 28 I.L.M. 1556, 1561.

Also of import is the position of the U.S. State Department, in the wake of the *Bankston* decision, that "the [*Bankston*] decision . . . is incorrect to the extent that it suggests that the Hague Convention does not permit as a method of service the sending of a copy of the summons and complaint by registered mail to a defendant in a foreign country." Letter from Alan J. Kreczko, U.S. Department of State Deputy Legal Advisor, to the Administrative Office of United States Courts and the National Center for State Courts (March 14, 1991), excerpted at 30 I.L.M. 260. Although not dispositive, courts often give great weight to treaty interpretations made by the Executive Branch. *See* Rest.3d of Foreign Relations Law of the United States § 326(2) (1986).

Although the Supreme Court has yet to address the question of the interpretation of the word "send" in Article 10(a), its approach in *Volkswagenwerk Aktiengesellschaft v. Schlunk* is instructive. 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988). *Volkswagenwerk* involved the applicability of the

---

**8.** Article 21 provides, in relevant part,

Each contracting State shall [at the time of the deposit of its instrument of ratification or accession, or at a later date] . . . inform . . . [the Ministry of Foreign Affairs of the Netherlands] where appropriate, of—

(a) opposition to the use of methods of transmission pursuant to articles 8 and 10.

**9.** Bruno Ristau, former Director of the Office of Foreign Litigation, U.S. Department of Justice, served as the United States representative to two Special Commissions convened by the Hague Conference on Private International Law to study and improve the implementation by member states of the Hague Service and Evidence Conventions.

Hague Convention to service of process on a German corporation where the wholly-owned domestic (United States) subsidiary was properly served under state law. In that case, state law provided that a wholly-owned domestic subsidiary was a foreign corporation's involuntary agent for service of process. The Court held that the Convention did not apply because state law allowed service on the domestic subsidiary, and therefore the circumstances did not present "an occasion to transmit a judicial document for service abroad" within the meaning of Article I of the Convention.

Article I of the Hague Convention provides:

> The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.

The Court, after noting that the Convention itself does not prescribe a standard for determining when such an "occasion" exists, held that the existence of an "occasion" for service abroad necessarily is determined, as a threshold matter, in accordance with the law of the forum state.

In thus construing the scope of the Convention, the Court interpreted Article I as referring to service of process in the technical sense, i.e. a "formal delivery of documents that is legally sufficient to charge the defendant with notice of a pending action." *Id.* at 700, 108 S.Ct. at 2108 (citations omitted). The Court grounded its interpretation in the documented negotiating history of the Convention, suggesting that the Court would use a similar approach if ever confronted with the question presented to this court in the instant case [10]. Observing that a preliminary draft of Article I read that the Convention shall apply in all cases in which there are grounds to transmit or give formal notice of a judicial or extrajudicial document in a civil or commercial matter to a person staying abroad, the court further noted that this language was changed in order to clarify that the Convention shall apply only to documents transmitted for service abroad. *Id.* at 701, 108 S.Ct. at 2108–09. Thus, under *Volkswagenwerk*, the Convention is irrelevant to documents which are not transmitted for service, and the *Bankston* rationale, which reads 10(a) as "merely provid[ing] a method for sending documents after service of process has been obtained", has been, in effect, overruled.[11]

More recently, in a case involving interpretation of the Warsaw Convention, the Supreme Court described its practice in interpreting treaties. The Court stated, "[B]ecause a treaty ratified by the United States is not only the law of the land, see Const., Art. II, § 2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (traveaux [preparatoires]) and the post-ratification understanding of the contracting parties." *Zicherman v. Korean Air Lines Co.,* — U.S. —, 116 S.Ct. 629, 133 L.Ed.2d 596 (U.S.N.Y.). This approach would ascribe great weight not only to sources such as the *Practical Handbook* and *Special Commission Report,* described in this opinion, but also to the position of the U.S. State Department, described above, and the understanding of the signatory states as evidenced by their declarations regarding 10(a).

For the foregoing reasons, including the purpose, logic and structure of the Convention itself, the interpretive approach taken by the Supreme Court in *Volkswagenwerk* and *Zicherman,* the position taken by the U.S. Department of State, and the understanding of international law experts as evidenced by the *Practical Handbook,* the *Special Commission Report,* and the Ristau treatise, the court finds that Article 10(a) provides for mail service and hereby declines to dismiss

---

**10.** Ristau concludes, on the basis of the negotiating history of Article 10, that sending of judicial documents by mail was intended to include service of process. Ristau, *International Judicial Assistance* § 4–3–5, citing to the Rapporteur's report on the final text of the Convention, at Service Convention Neg.Doc. at 373.

**11.** The reasoning of *Ackermann,* however, i.e. that 10(a) would superfluous unless it referred to sending documents for service, rings truer after *Volkswagenwerk* than it did previously.

this action for insufficiency of service of process.

**IT IS ORDERED** that defendants' motion to quash service on Giorgio Lumo is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that the motion to quash Federal Express service on Filanto through its representative Antonio Filograna is hereby **DENIED.**

**IT IS SO ORDERED.**